UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 5:09-CV-141-KSF

JOHN F. RUGGLES, JR., INC. d/b/a
RUGGLES SIGN COMPANY, INC.              PLAINTIFF

vs.            **OPINION AND ORDER**

VENTEX TECHNOLOGY, INC., et al.             DEFENDANTS

\* \* \* \* \* \* \* \*

This matter is before the Court on the motions of Defendants Neon Engineering, Inc. ("Neon"), Cincinnati Sign Supplies, Inc. ("CSS"), and Ventex Technology, Inc. ("Ventex") to exclude the opinion testimony of Ralph M. Francis, Jr. and Brent Lee [DE 57, 58, 63]. For the reasons stated below, the motions will be denied in part and granted in part.

**I. BACKGROUND**

John F. Ruggles, Jr., Inc. ("Ruggles") is in the business of constructing, installing, and servicing illuminated signs for sale to commercial businesses. [Amended Complaint ¶ 5]. John Ruggles started the business in 1946. [Cambron Depo. p. 131]. Many of Ruggles' signs are for interior locations, such as shopping malls. *Id.* at 12-13. One of Ruggles' customers, Limited Brands, owns the national "Victoria's Secret" retail stores. *Id.* pp. 27-28. In 2005, Limited Brands approached Ruggles to construct and install neon signs in Victoria's Secret stores for a nationwide advertising campaign. [Padgett Depo. p. 190]. Limited Brands produced artwork for the appearance of the signs, which were to look like pink scripted words or phrases, such as "Body by Victoria," "Angels," "I Love Victoria's," and the like. [DE 64-2]. Ruggles constructed the signs using power sources ("transformers") manufactured by Ventex after discussing the project signs with a representative from Ventex. [Cambron Depo. pp. 28-29, 38-41]. The Ventex transformers were purchased from Ventex distributors, Neon and CSS. The Victoria's Secret campaign was rolled

out in 2007, and no problems were experienced with signs installed prior to April or May 2007. *Id.* at 40-41. Initially, Ruggles used some Ventex black transformers and black transformers covered in white vinyl, but then Ventex manufactured for Ruggles a transformer with a solid white case. [Padgett Depo., pp. 55-56].

By July 2007, Ruggles knew they really had problems with the Victoria's Secret signs because many were dimming or darkening in certain areas. [Cambron Depo., pp. 41, 84]. Tim Cambron described it as "mass failures from Maine to California" and his "industry's worst nightmare." *Id.* at 77. Brent Lee of Lee Neon Signs, Inc., who processed the neon glass used in the signs, worked with Ruggles to identify the problem, along with Ventex and others. [Padgett Depo. pp. 79-80]. Ruggles changed every possible variable in the signs in an attempt to locate the problem and determined that when the Ventex transformer was changed, that "made [the] problem go away." *Id.* at 79-81. Lee disavowed Ventex's conclusion that the problem was in the processing of the neon glass, and found through experimentation that the problem was solved by replacing the Ventex transformers. [DE 51-3]. Ruggles sought the opinion of an outside consultant, Bud Francis, who analyzed wave forms of several transformers and concluded in March 2008 that the Ventex transformers caused the darkening in the Victoria's Secret signs. [DE 51-1].

Ventex conducted its own in-house testing and concluded the problem was not the transformers, but rather the darkening was caused by the electrodes incorporated into the signs or irregularities in the processing of neon gas. [Parker Memo., DE 61-12, Ex. K]. Ventex modified some of its transformers, however, and shipped 450 units to Ruggles, at no charge, as a "gesture of support to ... a good customer over the years." [DE 61-13, Ex. L]. The modified transformers seemed to solve the problem. Ventex offered to provide Ruggles with a discount on future modified units, but Ruggles declined to purchase any additional Ventex units. [DE 61-14, Ex. M].

Ruggles filed this action against Ventex and its distributors and alleged claims of detrimental reliance on representations by Ventex, breach of warranty by Ventex and its distributors, failure to
2

warn Ruggles that the transformers could not perform as promised, breach of express warranty of merchantability, breach of implied warranty of merchantability, breach of express warranty that the transformers were designed for their intended use by Ruggles and would work in a quality manner, breach of express and implied warranties under KRS 355.2-313, and a UCC violation for disclaiming warranties. [Amended Complaint]. Ruggles offered as expert reports in support of the claims the problem-solving email messages from Bud Francis and Brent Lee, along with Francis' photographs and an opinion paragraph prepared by Lee. Francis and Lee were identified as expert witnesses. Francis was deposed on October 22, 2010; and Lee was deposed May 27, 2010, and again on November 4, 2010. [DE 62, 68].

Neon and CSS moved to exclude the opinion testimony of Francis on the grounds that his report did not meet the requirements of Fed. R. Civ. P. 26(a)(2)(B), and his testimony did not meet the requirements for admissibility [DE 57]. With respect to the report, they complain that it refers to "cursory observations"; lacks specific facts or data relied upon; lacks any testing or scientific method employed; is subjective and incomplete; and is not reliable. [DE 57, pp. 4-5, 10-14]. Neon and CSS further complain that Francis' opinion provides only an ultimate conclusion with no analysis, fails to account for obvious alternative explanations, requires future testing to confirm, offers nothing more than a mere possibility, and lacks foundational reliability. *Id.* at 14-16. Neon and CSS are particularly critical that Mr. Francis' opinion is based on "nothing more than his experience, not scientific data or testing." [DE 84, pp. 2, 5]. They claim that "[w]here an expert opinion is merely based upon experience, it is not admissible." *Id.* at 6.

Ventex contends Francis' testimony should be excluded because his "'testing' consisted of connecting an oscilloscope to the power supplies from a single neon sign and taking pictures of the results displayed on a screen with a digital camera." [DE 63-1, p. 6]. Ventex notes that "Mr. Francis spent less than one full day testing a few of the original Ventex power supplies and a few of the modified VT-12030-120s ('Modified VT 120's')" and concluded from this testing that "the

original Ventex power supplies caused the darkening or dimming issues in the Victoria's Secret signs." *Id.* They complain that he did not label his photographs and cannot connect the results to a particular power supply so that his data can be replicated. *Id.* at 6-7. They further complain that he did not do any disassembly of the transformers, he does not understand the operation of a neon sign, and he did not conduct testing on the signs with a digitizing scope. *Id.* at 6-10, 15-18. Mr. Francis opined that a lack of DC bus filtering contributed to tube darkening, but Ventex notes that Francis did not know what type of DC bus filtering the Ventex transformer may have had. [DE 80, p. 4]. Francis further claimed that a lack of wave symmetry would cause mercury migration in the sign, but Ventex notes he could not offer other reasons for tube darkening. *Id.* at 5. Ventex argues that the fact the signs have worked properly after the Ventex transformers were replaced is irrelevant and has no bearing on the reliability of Francis' opinions. *Id.* at 8. Finally, Ventex claims that Francis' testimony is not relevant because he does not have sufficient "expertise about the effect of certain electrical problems on the appearance of a neon sign" so as to make his testimony helpful to the factfinder. *Id.* at 10.

## II. ANALYSIS

### 1. *Daubert* Standard

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. In the exercise of its gatekeeping role under FRE 702, a district court is responsible for determining the relevance and reliability of all expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The Sixth Circuit summarized the standard for admissibility of expert testimony as follows:

> [A] proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements. First, the witness must be qualified by "knowledge, skill, experience, training, or education." Fed.R.Evid. 702. Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Third, the testimony must be reliable. *Id.*

*In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 528-29 (6th Cir. 2008). The proponent of expert testimony must prove by a preponderance of the evidence that the testimony is reliable, not that it is scientifically correct. *Daubert*, 509 U.S. at 593. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596. "But 'rejection of expert testimony is the exception rather than the rule,' and we will generally permit testimony based on allegedly erroneous facts when there is some support for those facts in the record." *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 530 (6th Cir. 2008), quoting Fed.R.Evid. 702 Advisory Committee Comment to 2000 Amendment.

    **2.    Bud Francis**

The Court first notes that Mr. Francis' "expert report" offered by Ruggles is one of the worst this Court has seen. Francis' emails in March 2008 obviously were prepared as practical, "problem-solving" documents, rather than a formal expert report. [DE 51-1]. However, these emails include photographs of the waveform of the black transformer on the sign and his opinion that the transformer produced an "asymmetrical waveform envelope" causing elemental migration and "high voltage pulse bursts," which are "known to cause electrode damage." Francis discussed the new, modified Ventex transformers with the solid white case and noted that they "corrected the design problem found in the earlier transformer models" and that he "would be comfortable with this new design." *Id.* He identified two problems with the earlier transformers, "the lack of DC bus filtering" and the "obvious lack of wave form symmetry." These emails were provided to Ventex March 18, 2008. DE 72-3, Ex. C]. Ventex responded in an email dated March 25, 2008, "we are not asking for any additional tests to be run by your consultant." Instead, they only wanted the pictures and data from Francis. *Id.* On April 29, 2008, Ventex said: "We do not need any further clarification from Bud Francis." [DE 72-4, Ex. D].

Neon and CSS rely on *Snyder v. American Honda Motor Co., Inc.*, 2009 WL 2342733 (E.D. Ky. 2009), to argue that the weaknesses in Francis' report preclude his testimony. [DE 57, p. 11]. There, the expert report was nothing but conclusions and did not establish important elements of Snyder's product liability case. *Id.* at *5. The *Snyder* court excluded the testimony as a sanction for failure to disclose, but noted that a defective report may be harmless. *Id.* at *6.

Mr. Francis has extensive experience with transformers. He became an electrical engineer in 1972 and, since 1989, has been the owner of "a company that designs and manufactures high voltage transformers." [DE 51-2, Ex. B]. When he offered his opinion three years ago, Ventex said it did not need any additional testing and only wanted the data and photos on which he relied. There is no indication Mr. Francis was deliberately holding back any information from his report. He even supported the use of the modified Ventex transformer after finding that it corrected the problems associated with the earlier transformers. [DE 51-1]. He still has the sign and items tested if anyone were interested in replicating the tests. [Francis Depo., p. 35, 37]. Francis was deposed at length by the defendants regarding the testing he conducted with an oscilloscope on several Ventex transformers and the resulting wave length photographs. [Francis Depo.]. He uses an oscilloscope almost every day in his current business. *Id.* at 51-53. It is the opinion of this Court that any failure to disclose by Mr. Francis was harmless, and the Defendants have not been prejudiced thereby.

With respect to Ventex's criticism that the testing took less than one full day, the short answer appears to be that it does not take long to identify a problem when you know what to do. Regarding the failure to test further with a digitizing scope, Mr. Francis said the problem was obvious from the testing done. Ventex did not need further testing at the time and has not shown that further testing was necessary. Ruggles uses the analogy that when an x-ray shows a broken bone, it is not necessary to perform an MRI or CT scan to confirm the conclusion. [DE 72, p. 8]. The criticism that Francis could not eliminate all other causes of the darkened signs goes to the

6

accuracy of the testimony, not its admissibility. "The fact that several possible causes might remain 'uneliminated' ... only goes to the accuracy of the conclusion, not to the soundness of the methodology." *John v. Equine Services, PSC*, 233 F.3d 382, 390 (6th Cir. 2000), quoting *Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C. Cir. 1996).

Ventex's criticisms of Francis' failure to disassemble the transformers and his lack of expertise with the electrical and chemical reactions in neon signs is the stuff of which cross examination is made.[1] The impact of asymmetry in wave lengths and high voltage pulses in transformers is not common knowledge to lay jurors and would be very helpful to a factfinder who is attempting to determine the cause of the problems with the Victoria's Secret signs. Defendants' criticisms confuse reliability with accuracy. "[A] determination that proffered expert testimony is reliable does not indicate, in any way, the correctness or truthfulness of such an opinion." *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 529 (6th Cir. 2008).

The argument of Neon and CSS that testimony based on experience is not admissible, is not well taken. A similar criticism of experts was addressed by the Sixth Circuit as follows:

> The distinction between scientific and nonscientific expert testimony is a critical one.
> By way of illustration, if one wanted to explain to a jury how a bumblebee is able to fly, an aeronautical engineer might be a helpful witness. Since flight principles have some universality, the expert could apply general principles to the case of the bumblebee. Conceivably, even if he had never seen a bumblebee, he still would be qualified to testify, as long as he was familiar with its component parts.
> On the other hand, if one wanted to prove that bumblebees always take off into the wind, a beekeeper with no scientific training at all would be an acceptable expert witness if a proper foundation were laid for his conclusions. The foundation would not be related to his formal training, but to his firsthand observations. In other words, the beekeeper does not know any more about flight principles than the jurors, but he has seen a lot more bumblebees than they have.

*Berry v. City of Detroit*, 25 F.3d 1342, 349-50 (6th Cir. 1994). Similarly, in *Wellman v. Norfolk and Western Ry. Co.*, 98 F. Supp.2d 919 (S.D. Ohio 2000), the plaintiff's expert proposed to testify,

---

[1] Interestingly, Neon and CSS criticize Mr. Lee, who has extensive experience with neon, because he "has never designed a transformer or worked for a manufacturer of transformers." [DE 58, p. 4].

7

based only upon his experience and specialized knowledge of the railroad industry, about the proper and safe maintenance of a railroad yard with respect to debris dropped from loaded cars. *Id*. at 925, 927. The district court rejected the Daubert challenge as follows:

> In this case, the proffered expert, Walter C. Rockey, is not a scientist, nor is he an engineer. He does, however, have extensive experience in the railroad industry, as an employee, supervisor and government inspector. His proposed testimony is not based upon scientific evidence, is not subject to the traditional definition of peer review, and is not based upon verifiable and repeatable tests. Nonetheless, as Kumho Tire makes clear, the four-part Daubert test is flexible and is in no way a definitive checklist which must be met before the trial court, as gatekeeper, may admit the testimony.

*Id*. at 925. *See also Oaks v. Wiley Sanders Truck Lines, Inc.*, 2008 WL 4180267 (E.D. Ky. 2008) (testimony of truck company owner who had trained more than 1000 drivers was admissible regarding the standards for hiring, training and retaining drivers). Mr. Francis has specialized knowledge and experience with the design and operation of transformers, and he will be permitted to testify.

### 3. Brent Lee

Mr. Lee began working as a neon tube bender in 1986 after his high school graduation. [DE 51-5, Ex. E]. In 1988, he formed his own sign company, Lee Neon Signs, Inc., and has continued with the business ever since. Ruggles bought nearly all of the processed neon glass for the Victoria's Secret signs from Lee Neon. [Padgett Depo., p. 50]. Neon and CSS acknowledge that Lee may be qualified to testify on subjects relating to neon tube bending, but they argue he is not qualified by training or experience to testify about electric transformers. [DE 58, pp. 15-16].

All Defendants strenuously complain about Lee's "expert report." It consists of two emails and an unsigned and undated paragraph, along with his curriculum vitae. [DE 51-3, 51-4, 51-5]. The first email, dated January 28, 2008, is Lee's response to a report by Ventex's chief engineer that the dimming issues with the signs may be due to "variables in the tube processing." [DE 51-3]. Mr. Lee's email defends the processing of neon glass by his shop and offers to let anyone observe their operations. He notes that the electrode manufacturer specifies the processing procedures

for each electrode type, and that his company used the proper equipment and followed those specifications. He also states he has observed mercury migrating from the electrode. By way of example, he remarks about a new sign on a Ventex transformer where the mercury left one electrode and was dimming within two weeks. He says when he puts a magnetic transformer on that sign, it lights perfectly. Accordingly, he concludes that the "variables are existing somewhere else. NOT in the processing!" [DE 51-3]. The second email on the same day takes issue with Ruggles withholding payment on Lee's invoices to get someone's attention about the dimming signs. Lee responds that he had done everything he could to help resolve the issues with the Victoria's Secret signs. *Id.*

>The third part of the report is the unsigned paragraph which states in full:
>
>It is in my opinion that the dimming issues with the Victoria's Secret neon signs was [sic] not a result of improper neon processing. Dimming signs could be placed on a magnetic transformer and the dimming went away. Also, the dimming would go away when neon was placed on the Gatekeeper transformers. However, another brand of electronic transformers was tested other than the Ventex and it, too, had dimming issues. Therefore, it is my opinion that the dimming was caused by something in the wave form of the high frequency and not in the processing. If the neon was poorly processed, the neon would dim on any type of transformer.

[DE 51-4]. Once again, Mr. Lee is primarily defending the processing of neon glass by his shop. He acknowledged that he did not know how to read a waveform, and that the theory of "dead spots" was explained to him by a person at another company. [Lee November Depo., pp 66-67]. When asked whether the Ventex transformers were switching properly or not, Mr. Lee simply returned to his observation that the signs did not dim when some other transformers were used. *Id.* at 68-69.

Mr. Lee's report does not satisfy the Rule 26 requirements for an expert report. Instead, it more closely resembles the letter in *Snyder v. American Honda Motor Co., Inc.,* 2009 WL 2342733 (E.D. Ky. 2009). There are no facts, only conclusions. No facts of the testing are provided, and there are no photographs to record the results of the tests. However, even if the report did meet the discovery requirements or if the failure to disclose were considered harmless, this Court would not permit Mr. Lee to offer an expert opinion that "the dimming was caused by

something in the wave form of the high frequency." That opinion is not supported by the requisite foundation and is beyond his area of expertise. Accordingly, his proffered expert opinion will be excluded.

Mr. Lee is unquestionably an important fact witness. He has ample experience with the manufacture of neon signs. He was personally involved in processing many of the neon signs at issue and is fully qualified to describe that process and defend the work of his company. He also was personally involved in testing or supervising the testing of the various components of the problem signs and their installation. He can testify regarding the tests performed and the results he observed. This fact testimony will be subject to cross examination regarding his failure to document any of the testing and otherwise to question the credibility of his testimony.

### III.   CONCLUSION

**IT IS ORDERED** that:

1. The joint motion of Neon and CSS to exclude the opinion testimony of Ralph Francis [DE57] is **DENIED**;

2. The joint motion of Neon and CSS to exclude the opinion testimony of Brent Lee [DE 58] is **GRANTED**; and

3. The motion of Ventex [DE 63] to exclude both experts is **DENIED IN PART** with respect to Mr. Francis and **GRANTED IN PART** with respect to Mr. Lee.

This April 11, 2011.



Signed By:
*Karl S. Forester* KSF
**United States Senior Judge**